751 A.2d 1101 (2000)
331 N.J. Super. 365
In the Matter of the COMMITMENTS OF M.G. and D.C.
In the Matter of the Commitment of H.H.
Superior Court of New Jersey, Appellate Division.
Argued April 19, 2000.
Decided June 8, 2000.
*1103 Nancy Kaplen, Assistant Attorney General, for appellant State of New Jersey (John J. Farmer, Attorney General, attorney; in A-2188-99T3, Howard J. McCoach, Deputy Attorney General, of counsel; Daisy B. Barreto, Pamela N. Ullman and Mary Beth Wood, Deputy Attorneys General, on the brief; in A-3703-99T2, Ms. Wood, Maria B. Desautelle and Thomas F. Fichter, Deputy Attorneys General, on the brief).
William F. Culleton, Jr., Deputy Public Defender, for respondents M.G. and D.C. (Ivelisse Torres, Public Defender, attorney; Mr. Culleton, on the brief).
Lorraine M. Gormley, Deputy Public Defender, for respondent H.H. (Ms. Gormley, of counsel and on the brief; Jean Ross, Assistant Deputy Public Defender, on the brief).
Before Judges KING, CARCHMAN and LEFELT.
*1102 The opinion of the court was delivered by CARCHMAN, J.A.D.
This appeal requires us to consider the narrow but significant issue of whether an individual, who is either presently incarcerated or resident in a state psychiatric facility and on Conditional Extension Pending Placement (CEPP)[1] status, and who is subject to the Sexually Violent Predator Act, N.J.S.A. 30:4-27.24 to -.38 (the Act), is entitled to notice prior to temporary commitment to the Sexually Violent *1104 Predator facility at Kearny (Kearny). We hold that such notice is constitutionally required. We further conclude that the Office of the Public Defender is not entitled to a general listing of persons that are to be transferred to Kearny.

I.
Defendants on this appeal, M.G., D.C. and H.H.,[2] are all convicted sexual offenders subject to the Act. Following completion of their terms of incarceration, which included commitment to the Adult Diagnostic and Treatment Center (ADTC), they were involuntarily committed to a state psychiatric facility for further treatment. They have been represented by counsel since they were first committed. See R. 4:74-7(c)(3).
Upon completion of his maximum term of incarceration, M.G. was committed on June 3, 1999, to the Ann Klein Forensic Center (Forensic); thereafter, he was transferred to the Greystone Park Psychiatric Hospital (Greystone). On October 26, 1999, he was placed on CEPP status pending an appropriate placement outside of Greystone. Included within the alternative placements was a commitment to Kearny.
On the date that MG was ordered to CEPP status, the judge entered an order requiring the State to provide two weeks notice to M.G.'s attorney prior to any commitment to Kearny. The judge also ordered the State to provide the Public Defender's office with a general listing of persons to be transferred to Kearny. In ordering the notice and denying the State's application for reconsideration, the judge concluded that notice was required to satisfy "fundamental fairness, due process, [and] the patient's right to counsel...."
D.C.'s commitment process followed a similar pattern. He, too, was placed on CEPP status and, consistent with his prior ruling, the judge ordered fourteen days notice to counsel prior to consideration of placement to Kearny.
Although H.H. is similarly situated, an order was entered on January 27, 2000, pursuant to the Act, transferring him to Kearny for evaluation pending final hearing. That transfer renders the notice issue moot; therefore, we address only the propriety of the notice in the context of M.G. and D.C.

II.
Our analysis commences with a discussion of both the Act and the implications of commitment under the Act. The Act is part of the legislative response to sexual offenses and offenders. See, e.g., N.J.S.A. 2C:7-1 to -11 ("Megan's Law").[3] Prior to enactment of the Act, the State could only commit sexual predators under the general involuntary civil commitment statute. See N.J.S.A. 30:27.10. According to legislative findings, however, many sexually violent predators (SVPs) do not suffer from "a current, substantial disturbance of thought, mood, perception or orientation...." N.J.S.A. 30:4-27.25. Many SVPs suffer from mental conditions that do not necessarily lend themselves "to characterization under the existing statutory standard" for involuntary civil commitment. Ibid. Nonetheless, the Legislature found that civil commitment may "be warranted due to the danger the person may pose to others as a result of the mental condition." Ibid. Thus, the general commitment statute was modified to allow potentially long-term commitment of SVPs in a separate and secure facility. The notice requirements were not changed, despite the fact that most candidates for *1105 commitment under the Act are confined when the State's petition for commitment is filed. M.G. and D.C. were both under State control at the time of the commitment in issue here.
In an effort to secure appropriate post-sentence treatment for those convicted of offenses involving sexual violence, the Legislature identified a class of offenders as "sexually violent predators." A "sexually violent predator" is defined as
a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.
[N.J.S.A. 30:4-27.26.]
The Legislature amended the commitment statute, enabling the transfer of those determined to be SVPs to a more appropriate facility for specialized treatment designed specifically for sex offenders' behavior. N.J.S.A. 30:4-27.24. The Act requires that individuals committed pursuant to its terms receive treatment "appropriately tailored to address the specific needs of sexually violent predators." N.J.S.A. 30:4-27.34(b). The Kearny facility was established to provide such treatment. While the Act designates the Department of Corrections as the agency responsible for the operation of the facility, the patients are to be housed separately from prisoners. N.J.S.A. 30:4-27.34(a). Unlike a prison setting, the Act designates the Division of Mental Health Services as the agency responsible for providing appropriate treatment for residents at the Kearny facility. N.J.S.A. 30:4-27.34(b).
These residents are patients at a secure treatment facility, not inmates as suggested by the Public Defender. The treatment program is designed to provide comprehensive treatment services and is staffed by psychologists, psychiatrists, social workers, substance abuse counselors and other staff members with specialized training in the assessment and treatment of sexual deviance and personality disorders.
According to the State, the Kearny facility is designed to provide a non-judgmental, non-punitive therapeutic treatment program in a setting that is controlled, safe, and conducive to the treatment process. There are, however, some marked differences between the facility and other therapeutic placement facilities. Persons committed to Kearny are housed in locked rooms and monitored by uniformed correctional officers, some carrying weapons, who are employed by the Department of Corrections. Residents leaving the facility are shackled with handcuffs to waist chains and also with ankle cuffs. There are no opportunities at Kearny to advance to a less restrictive physical structure. For a full discussion of the background of the Act and a description of the therapeutic process, see Cornwell, Jacobi & Witt, The New Jersey Sexually Violent Predator Act: Analysis & Recommendations for the Treatment of Sexual Offenders in New Jersey, 24 Seton Hall Legis. J. 1 (1999).
The Act requires that the Attorney General be notified ninety days before the release of any person who may meet the criteria of a SVP. N.J.S.A. 30:4-27.27. Upon notification, the Attorney General may initiate a court proceeding by presenting to a judge for immediate review the certification of two doctors, one of whom must be a psychiatrist, who have examined the person no more than three days before the petition for commitment. N.J.S.A. 30:4-27.28; 30:4-27.26. The judge may temporarily commit the person upon finding that there is probable cause to believe the person is a SVP. Ibid.
Once temporarily committed, the alleged SVP is entitled to a hearing addressing the individual's continued commitment within *1106 twenty days. N.J.S.A. 30:4-27.29. The Attorney General is required to provide notice ten days prior to this hearing to the individual, the individual's next-of-kin, and the individual's attorney, among others. N.J.S.A. 30:4-27.30. The individual may be retained if the reviewing court finds by clear and convincing evidence that the alleged SVP is indeed a SVP. N.J.S.A. 30:4-27.32. Every twelve months after this initial determination, a court must review the need for continued commitment. N.J.S.A. 30:4-27.35.
The Act only requires notice be given to a patient and the patient's next-of-kin, guardian, and attorney twenty-four hours prior to transfer if that patient is in a "short-term care facility" or "special psychiatric hospital." N.J.S.A. 30:4-27.28(h). Neither of these circumstances are factually involved or relevant to this appeal.
There is no other provision in the Act mandating notice to an incarcerated individual or one on CEPP status prior to a petition for involuntary commitment. A careful examination of the Act demonstrates that it simply utilizes the model of the civil commitment statutes, which does not provide for prior notice for involuntary commitment. See N.J.S.A. 30:4-27.10; 30:4-27.12; 30:4-27.13; 30:4-27.28, 30:4-27.29, and 30:4-27.30. Moreover, a careful review of the legislative history as set forth in the statements and findings reveals no reference to notice prior to presentation or execution of the commitment order.
In determining that notice was required under the Act, the judge focused on procedural due process. The State asserts that there is no constitutional requirement for such notice under any notion of due process.

III.
Due process is a flexible concept. Gilbert v. Homar, 520 U.S. 924, 930, 117 S.Ct. 1807, 1812, 138 L.Ed.2d 120, 127 (1997); Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307, 1321, reh'g denied, 364 U.S. 855, 81 S.Ct. 33, 5 L.Ed.2d 79 (1960); Logan v. Arafeh, 346 F.Supp. 1265, 1268 (D.Conn.1972); aff'd, Briggs v. Arafeh, 411 U.S. 911, 93 S.Ct. 1556, 36 L.Ed.2d 304 (1973). It "`is not a technical conception with a fixed content unrelated to time, place and circumstances.'" Gilbert, 520 U.S. at 930, 117 S.Ct. at 1812, 138 L.Ed.2d at 127 (quoting Cafeteria & Restaurant Workers Union, Local 473 v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230, 1236, reh'g denied, 368 U.S. 869, 82 S.Ct. 22, 7 L.Ed.2d 70 (1961)). Determining what is required to satisfy due process under a "given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." Cafeteria & Restaurant Workers Union, 367 U.S. at 895, 81 S.Ct. at 1748, 6 L.Ed.2d at 1236.
Several factors must be weighed in determining what procedural protections are required by the Constitution. Zinermon v. Burch, 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100, 115 (1990). They include:
[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
[Ibid. (quoting Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 33 (1976)).]
If the weighing process falls in favor of the private interest involved, then a form of pre-deprivation hearing must be held before the State deprives an individual of liberty or property. Ibid. However, post-deprivation hearings may satisfy procedural *1107 due process where quick action by the State is necessary or providing pre-deprivation process is impractical. Ibid.
The United States Supreme Court has directly addressed the nature of involuntary commitment to a psychiatric facility. Commitment to a mental hospital is "`a massive curtailment of liberty.'" Vitek v. Jones, 445 U.S. 480, 491, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552, 564 (1980) (quoting Humphrey v. Cady, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394, 402 (1972)); see In re D.C., 146 N.J. 31, 48, 679 A.2d 634 (1996) (citing In re S.L., 94 N.J. at 137, 462 A.2d 1252) (noting that commitment engenders a "great restraint on individual liberty"). Therefore, the State's power of commitment "`is constitutionally bound,' and its exercise must `comply with due process.'" Ibid. As a result, persons subject to involuntary commitment are "entitled to a judicial hearing, a right of notice, the right to present evidence, and the right to be represented by counsel." Ibid.
To determine whether prior notice is necessary to satisfy due process requirements when the State attempts to confine an individual under the Act, we explore the process of general involuntary commitment and the due process implications that arise in such situations.
Commitment is justified where an individual is likely to pose a danger to self, others, or property because of mental illness. N.J.S.A. 30:4-27.9(b); S.L., 94 N.J. at 138, 462 A.2d 1252 (citing State v. Krol, 68 N.J. 236, 257, 344 A.2d 289 (1975)). In addition to a showing of mental illness, commitment requires a showing of a "`substantial risk of dangerous conduct within the reasonably foreseeable future.' " Id. at 138, 462 A.2d 1252 (quoting Krol, 68 N.J. at 260, 344 A.2d 289). The goal of commitment is "`to protect society's very strong interest in public safety... in a fashion that reasonably minimizes infringements upon [the individual's] liberty and autonomy.'" Id. at 138, 462 A.2d 1252 (quoting Krol, 68 N.J. at 257-58, 344 A.2d 289) (alteration in original).
The Act requires more than a general showing that an individual is a danger to self, others, or property. It requires a finding that the individual is "[l]ikely to engage in acts of sexual violence," which means that the individual's propensity "to commit acts of sexual violence is of such a degree as to pose a threat to the health and safety of others." N.J.S.A. 30:4-27.26. The Act mirrors the involuntary commitment statute in that it permits a probable cause hearing without notice, and temporary commitment pending the final hearing. Both statutes provide only that a final hearing be conducted within twenty days of the temporary commitment order. N.J.S.A. 30:4-27.12; 30:4-27.29.
The lack of prior notice in the case of general involuntary commitment does not violate due process requirements provided that the individual has "an adequate means of testing the validity of [the] confinement within a reasonable period of time." Logan, 346 F.Supp. at 1268 (citations omitted). However, this exception to pre-deprivation process applies in emergency situations, in which the individual is at large in the community or in custody and is believed to be an immediate danger to self, others, or property. See ibid. (emphasis added). The temporal nature of the individual's immediate condition is the critical element in assessing due process considerations. Immediate action without notice based on emergent circumstances is the exception rather than rule. The exception is practical and necessary. Prior notice of temporary commitment would serve little useful purpose to one who is unrestrained within the community because the individual is potentially dangerous and, in many cases, incapable of understanding the nature of his or her acts. A post-deprivation hearing is appropriate and constitutionally permissible in such cases because "the threat of harm to the [individual] or others is of such a nature that confinement must take place immediately. *1108 When the choice is between a loss of life or health and a loss of liberty for a brief period of time, the preferable alternative is apparent." Coll v. Hyland, 411 F.Supp. 905, 910 (D.N.J.1976) (holding that in general involuntary commitment situation, preliminary commitment hearing is not constitutionally required because New Jersey law requires that a final hearing be held within twenty days). Notice would be an illusory act that would provide form but little substance. Therefore, an individual's due process rights are safeguarded by appropriate notice within a reasonable time after temporary commitment. The lack of prior notice does not invalidate the commitment because the purpose of the temporary and emergent commitment is to protect society as well as individuals who are cognitively incapable of self-protection.
In the present case, both D.C. and M.G. were on CEPP status at Greystone. Such status designates individuals who are legally entitled to leave a mental hospital because they are not considered dangerous. See R. 4:74-7(h)(2); S.L., 94 N.J. at 139, 462 A.2d 1252 (authorizing CEPP status for a patient otherwise entitled to discharge but who is awaiting "an appropriate placement"). Although theoretically discharged, they remain confined pending further order of the court. See ibid. They remain confined because they "are incapable of competently exercising" the right to be discharged because of a diminished capacity to survive in the outside world. S.L., 94 N.J. at 139, 462 A.2d 1252. The State "retains substantial control over the individual's life and liberty in the process of arranging for appropriate placement." Id. at 140, 462 A.2d 1252.
Prior notice of commitment under the Act will not pose a threat of danger in this case because D.C. and M.G. are not free to leave Greystone. Conversely, depriving them of notice before transferring them to Kearny strips them of a significant liberty interest. The Public Defender asserts that
[t]ransfer to Kearny for commitment terminates that patient['s] private interests... immediately and irrevocably. Given the differences in commitment standards, any person who might be found non-committable under the Act at a post-deprivation hearing would not be able to return to the hospital and regain the state[-]created rights that he or she lost when transferred to Kearny. By long[-]standing practice and law, there is no right to voluntary admission to Greystone. As CEPP patients, M.G. and D.C. would not be readmitted. Nor can these patients lose the stigma that even temporary commitment to Kearny would entail, or regain placement opportunities lost because of the transfer. Thus, the harm from incorrect determinations based on ex parte applications for commitment is irreparable and the procedural protection is necessary before the initiation of temporary commitment to prevent erroneous deprivations.
We need not address the accuracy of this contention, except to note the serious and potentially irrevocable consequences of an erroneous temporary commitment and the resultant change in status from that of a CEPP patient in a psychiatric hospital to placement in the Kearny maximum security facility. We reiterate that lack of notice is the exception rather than the rule.
Weighing the factors required by the balancing test in Zinermon reveals that a significant liberty interest is implicated under the present facts and that this interest is not outweighed by any governmental interest. See Zinermon, 494 U.S. at 127, 110 S.Ct. at 984, 108 L.Ed.2d at 115. The private interest affected is related to the patients' current status; they will be stripped of their CEPP status and transferred to a facility designated for SVPs without prior notice. See ibid. Involuntarily committing individuals who are confined on CEPP status to a facility designated for SVPs is similar to an involuntarily commitment of prisoners to a mental institution. In the latter context, the *1109 United States Supreme Court has noted that
[t]he loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement. It is indisputable that commitment to a mental hospital "can engender adverse social consequences to the individual" and that "[w]hether we label this phenomena `stigma' or choose to call it something else ... we recognize that it can occur and that it can have a very significant impact on the individual."
[Vitek, 445 U.S. at 492, 100 S.Ct. at 1263, 63 L.Ed.2d at 564 (quoting Addington v. Texas, 441 U.S. 418, 425-26, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323, 331 (1979)).]
Thus, the patients' current confined status does not alter their right to appropriate procedural protections. Even convicted felons who are incarcerated are "entitled to the benefit of procedures appropriate in the circumstances before [being] found to have a mental disease and transferred to a mental hospital." Vitek, 445 U.S. at 493, 100 S.Ct. at 1263, 63 L.Ed.2d at 564-65. The individuals on this appeal have a significant liberty interest in remaining in a CEPP-status environment, and appropriate notice would significantly lessen the risk of erroneous placement at Kearny. See Zinermon, 494 U.S. at 127, 110 S.Ct. at 984, 108 L.Ed.2d at 115.
The State's interest in denying these individuals prior notice is minimal at best. The State has failed to demonstrate that prior notice would cause a demonstrable fiscal or administrative burden. To counter the argument that prior notice is required under these circumstances, the State claims that such notice creates a risk of "elopement" or of "agitation," which is disruptive to the therapeutic process. In support of these claims, the State offers the case of an individual who was "residing in one of the state psychiatric hospitals." After learning that he would soon be transferred to Kearny, the patient "eloped from the hospital and was missing for approximately three days before being apprehended and moved to a secure facility." According to the State, "[t]his example clearly demonstrates the public safety issue in not providing notice prior to seeking temporary commitment under the Act." However, this single anecdotal episode is insufficient to justify depriving others of procedural due process. Moreover, the State acknowledged at oral argument that appropriate security measures can be implemented to recognize and minimize or eliminate this risk.
As we stated earlier, post-deprivation hearings may satisfy procedural due process where timely action by the State is necessary or providing pre-deprivation process is impractical. Zinermon, 494 U.S. at 127, 110 S.Ct. at 984, 108 L.Ed.2d at 115 (citations omitted). In the present case, aside from the assertion that prior notice may cause "elopement," or "agitation," the State has failed to demonstrate that such emergency action is necessary or notice impractical. The State knows far in advance that it will file a petition to have patients transferred to Kearny.
The minimal burden to the State, which entails providing notice of its intentions to the individual through counsel sooner than it otherwise would have, is strongly outweighed by the potential burden and loss to the individuals targeted by the Act. The denial of pre-deprivation process is justified only in exceptional circumstances. Such circumstances are not present here. The State has not provided sufficient justification for depriving D.C., M.G., and other similarly-situated individuals of procedural due process.
Other jurisdictions that have enacted similar statutes have more expansive notice provisions. At least sixteen states have a statute governing involuntary commitment of sexually violent predators.[4]
*1110 Many of those states have patterned their sexually violent predator statutes after the Washington model. The Washington statute, enacted in 1990, requires that upon the filing of a petition alleging that a person is a sexually violent predator, the judge must make a preliminary probable cause determination as to whether the individual is a sexually violent predator. Wash. Rev.Code Ann. § 71.09.040(1) (West 2000). If such probable cause is found, the person is taken into custody. Ibid. Within seventy-two hours of the person being taken into custody, the court must hold a second probable cause hearing. § 71.09.040(2). The subject of the petition must be given notice of and an opportunity to appear at the hearing to contest probable cause. Ibid.
States with statutes virtually identical to Washington's include Arizona, Illinois, Iowa, Kansas, Massachusetts, Missouri, South Carolina, and Wisconsin. The remainder of the nation's sexually violent predator statutes vary procedurally. For instance, California requires that individuals be given notice of the probable cause hearing and assistance of counsel at the hearing, except in emergency situations in which the individual is scheduled to be released before a probable cause hearing can be held. Cal. Welf. & Inst.Code §§ 6601-6604 (West 2000). North Dakota requires that if respondent is detained when the petition is filed, a copy of the petition and written notice of the right to a preliminary hearing and a commitment hearing be given to respondent. N.D. Cent.Code § 25-03.3-06 to -03.13 (1999). The statute also provides the individual with the right to testify and to present and cross-examine witnesses at the probable cause hearing, and requires a final commitment proceeding within thirty days. Ibid. Virginia requires that a copy of the petition be served personally on the respondent and respondent's attorney, and requires the court to schedule a probable cause hearing within thirty days. Va.Code Ann. § 37.1-7.02 to -70.9 (Michie 1999).
Florida provides for transfer upon release from incarceration of all persons convicted of sexually violent offenses to an appropriate secure facility at which an individual must be assessed by a "multidisciplinary team" within seventy-two hours after transfer. Fla. Stat. Ann. § 394.9135(1), (2) (West 2000). The state attorney then has forty-eight hours in which to file a petition alleging that the individual is a sexually violent predator. § 394.9135(3). The judge makes an initial probable cause determination and decides whether to hold an adversarial probable cause hearing if "necessary." § 394.915(2).
Minnesota does not have an independent SVP statute. Rather, the state has one civil commitment statute that applies to the general mentally ill population as well as sexually dangerous persons. There must be a finding of probable cause to hold a person for more than seventy-two hours. Minn. Stat. Ann. § 253B.07(7)(a). The proposed patient and patient's counsel must be given at least twenty-four hours written notice of the preliminary hearing. Id. § 253B.07(5)(b). The individual is to be represented at the preliminary hearing by counsel. Ibid. The final commitment hearing must be held within fourteen days from the date the petition is filed. Id. § 253B.08(1). The patient and patient's counsel are entitled to at least five days' notice of the hearing and at least two days' notice of the date and time of the hearing. Id. § 253B.08(2).
The Texas statute is designed to begin the commitment process of sexually violent predators long before the individuals are released from confinement. It does not appear to require notice or a probable cause hearing. Tex. Health & Safety Code *1111 Ann. § 841.005 to .062. Rather, it provides for an elaborate evaluation system prior to the individual's release. If a petition is filed alleging that the person is a sexually violent predator, § 841.041(a), a trial must be conducted not more than sixty days afterwards, § 841.061.
Finally, the Kansas Sexually Violent Predator Act (Kan. Stat. Ann. § 59-29a01 (Supp.1996)), which was held to be constitutional by the United States Supreme Court, Kansas v. Hendricks, 521 U.S. 346, 371, 117 S.Ct. 2072, 2086, 138 L.Ed.2d 501, 521 (1997), requires a finding of probable cause, transfer to a secure facility for professional evaluation, Kan. Stat. Ann. § 59-29a05, and then a plenary jury trial to determine beyond a reasonable doubt whether the individual is a SVP, § 59-29a06. After completion of these procedural and substantive steps, the SVP is transferred to the custody of the secretary of social and rehabilitative services for appropriate treatment. § 59-29a07(a).
In sum, New Jersey stands at the outer edge of affording an individual any notice or opportunity to challenge the bona fides of an initial commitment order to the Kearny facility. We conclude that at a minimum under Zinermon, the individual should have reasonable notice of the temporary commitment and an opportunity to assess the commitment application prior to entry of such commitment order.

IV.
We conclude that such notice prior to commitment is necessary to establish there is a prima facie basis to warrant commitment. See Gerstein v. Pugh, 420 U.S. 103, 119, 95 S.Ct. 854, 866, 43 L.Ed.2d 54, 68 (1975). The notice and right of an alleged SVP to challenge the documents submitted to the court need not involve testimony nor resolve crucial evidentiary or credibility questions. These issues can be addressed at the twenty-day hearing following the commitment. See id. at 120-21, 95 S.Ct. at 866-67, 43 L.Ed.2d at 69. The probable cause hearing will resolve the issue of whether the State has made the requisite threshold showing under the Act and whether it is reasonable given "`the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act'" that the alleged SVP warrants commitment. Id. at 121, 95 S.Ct. at 866, 43 L.Ed.2d at 69 (quoting Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1890 (1949)). The probable cause hearing, which we conclude satisfies due process requirements, shall be limited to an inquiry as to whether the documentation provided to the judge satisfies the statutory requirements for commitment. We recognize that in many cases there will be no preliminary challenge, and any appropriate challenge will be reserved until the twenty-day post-commitment hearing.
We acknowledge that historically in probable cause hearings in criminal cases, an accused is allowed to cross-examine the witnesses presented by the State. R. 3:4-3. The rules of evidence do not apply, and an accused is entitled to counsel. In re J.G., 151 N.J. 565, 592, 701 A.2d 1260 (1997) (citations omitted).
We perceive the pre-commitment notice and procedure to be more restrictive than a criminal probable cause hearing. As we have noted, at this presentation, the alleged SVP shall not have the right to cross-examine the physicians who prepared the certifications. See Pugh, 420 U.S. at 123, 95 S.Ct. at 868, 43 L.Ed.2d at 71. The alleged SVP may only challenge the State's showing that there is prima facie evidence that the individual is a SVP. See ibid. The SVP will be entitled to a full array of procedural safeguards during the post-commitment process. The statutory requirement that a plenary hearing shall take place within twenty days after commitment insures that an alleged SVP will have a timely opportunity to challenge the commitment, including, at that time, the right to cross-examine and test the credibility of the certifications that have occasioned *1112 the commitment in the first instance.
To establish probable cause that a person is a SVP under the Act, the State must establish that the person has been convicted, adjudicated delinquent or found not guilty by reason of insanity of a sexually violent offense, as defined by N.J.S.A. 30:4-27.26, or found incompetent to stand trial for a sexually violent offense. The State must also establish that the person suffers from a mental abnormality or personality disorder that makes the person likely to engage in sexually violent acts unless confined. Ibid.
To satisfy this statutory burden, the State must present the judgment or order that demonstrates that the person has been convicted, adjudicated delinquent or found not guilty by reason of insanity of a sexually violent offense or has been found incompetent to stand trial for a sexually violent offense. See N.J.S.A. 30:4-27.28; 30:4-27.26. The State must also present the clinical certificates of two physicians, one of whom is a psychiatrist, that certify that the person is a SVP. Ibid. These certificates must include the facts that led the physicians to their conclusions. Ibid.; N.J.S.A. 30:4-27.26.
To restate what we noted earlier, we are not unmindful of the concerns expressed by the State; however, we find no undue burden placed on the State to provide appropriate notice consistent with the requirements of due process. We have no doubt that the State is capable of dealing with the potential for elopement upon notice being given and that the "agitation" created by such notice can be appropriately addressed by the mental health professionals and security personnel at the various institutions where the alleged SVPs are being held.
The State has expressed concern that the statute requires the certifications to be executed no less than three days prior to the commitment. See N.J.S.A. 30:4-27.26. We first note that the three-day requirement was adopted from the emergency temporary commitment model. It bears no reasonable relationship to the reality of an alleged SVP who has been incarcerated or held in a State institution, where he or she has been the subject of prior examination and scrutiny, for presumably an extended period of time. The State argues that the three-day requirement precludes notice. Such a statutory requirement, however, cannot shield the State against due process considerations protected by the Constitution. To the extent that the three-day requirement precludes meaningful notice, it must yield to the Constitution and due process requirements. Again, we note that no unfair burden is placed on the State. We are not addressing in this case an issue in which an alleged SVP is at large or in the community where the State may be required to take immediate and emergency action. That circumstance obviously implicates issues and considerations neither present nor addressed here. M.G. and D.C. were in the custody and control of the State when the petition was filed, and no such immediate or emergency action was required.
We conclude, therefore, that the State must provide notice to individuals who are in a state facility on CEPP status before a temporary commitment hearing. Upon receiving such notice, the alleged SVP may challenge whether the documentation submitted to the court for temporary commitment meets the requirements of N.J.S.A. 30:4-27.26. Such challenge shall not involve testimony, which shall be reserved for final hearing. The notice requirement and ability to challenge the probable cause requirement shall satisfy any due process concerns. Although the judge ordered two weeks notice, we are satisfied that seven days notice meets both the needs of the State and the alleged SVP, and we modify the Law Division's order accordingly.
Lastly, we find no basis for the Public Defender's demand that she be provided with a list of individuals under consideration *1113 for commitment. We find that neither the Constitution nor the Act requires such listing or notice and reject the claim.
We affirm the order requiring notice of the commitment, modify the order requiring two weeks notice, and vacate that provision of the order requiring submission of a list of individuals under consideration for future commitment.
NOTES
[1] CEPP status refers to a patient who is otherwise entitled to be discharged but who cannot be discharged immediately because an appropriate placement is unavailable. See R. 4:74-7(h)(2); In re S.L., 94 N.J. 128, 139-40, 462 A.2d 1252 (1983).
[2] We have consolidated these matters for the purpose of this opinion.
[3] The issues in this case do not implicate Megan's Law. However, we note that the individuals involved in this appeal remain subject to the various provisions of other relevant legislation, including the notice requirements of Megan's Law.
[4] Many states refer to the individuals as "sexually violent persons" or "sexually dangerous persons" rather than "sexually violent predators." For the sake of clarity, the latter term is used herein to refer to any such statute.