813 A.2d 1252 (2003)
357 N.J. Super. 55
In the Matter of the CIVIL COMMITMENT OF V.A.
Superior Court of New Jersey, Appellate Division.
Argued October 30, 2002.
Decided January 21, 2003.
Mary Beth Wood, Deputy Attorney General, argued the cause for appellant (Peter C. Harvey, Acting Attorney General, attorney; Nancy Kaplen, Assistant Attorney General, of counsel; Ms. Wood, on the brief).
Nichole R. Nunes, Designated Counsel, argued the cause for respondent (Yvonne Smith Segars, Public Defender, attorney; Ms. Nunes, of counsel and on the brief).
Before Judges KING, WECKER and FUENTES.
The opinion of the court was delivered by *1253 FUENTES, J.A.D.
The State appeals from an order of the Law Division conditionally discharging respondent V.A. from his commitment under the Sexually Violent Predator Act (SVPA). N.J.S.A. 30:4-27.24 to 27.38. Based on the record before us, we are satisfied that the conditions imposed under the discharge plan releasing V.A. into the community do not provide the gradual de-escalation of restraints required under In re the Commitment of E.D., 353 N.J.Super. 450, 803 A.2d 166 (App.Div.2002). We therefore vacate the order of discharge and direct the Department of Human Services to develop and implement a comprehensive program of intermediate levels of restraints for individuals committed under the SVPA. The ultimate goal of such a program would be the individual's full discharge into the community.

I
V.A. is a forty-one year old man with a long and persistent history of sexual offenses. On June 12, 1984, he was arrested and charged with two counts of sexual assault and two counts of criminal sexual contact on a thirteen-year-old girl. V.A. gained access to the victim's residence by subterfuge and while there, fondled and kissed the child and attempted to have sexual intercourse with her. Pursuant to a plea agreement, V.A. pled guilty to one count of third degree criminal sexual contact, N.J.S.A. 2C:14-3a, and was incarcerated for a five-year term.
Approximately one week after his release from prison, V.A. became involved with a fourteen-year girl, whom he later married. This child was a friend of V.A.'s thirteen-year-old victim. He was initially charged with a sexual offense but the charges were dismissed when V.A. produced a copy of the marriage certificate. The record does not disclose the subsequent history or the current state of the marriage.
In 1994, V.A. was arrested and charged with aggravated sexual assault, sexual assault, endangering the welfare of a child, and child abuse, naming his four-year-old niece as the victim of those offenses. V.A. admitted that while babysitting, he touched the child's buttocks and vagina. In 1995, pursuant to a plea agreement, defendant pled guilty to one count of aggravated sexual assault, N.J.S.A. 2C:14-2a(1), and was sentenced to a seven-year prison term at the Adult Diagnostic and Treatment Center (ADTC) as a compulsive and repetitive sexual offender. N.J.S.A. 2C:43-7.[1]
On May 5, 1999, prior to his release from the ADTC, V.A. was civilly committed to the Ann Klein Forensic Center pursuant to the provisions of N.J.S.A. 30:4-27.10(c) and R. 4.74-7. These proceedings were instituted by the State as a stopgap measure since V.A. was scheduled to be released from the ADTC before the effective date of the SVPA. On November 9, 1999, the State filed a petition seeking V.A.'s continued commitment under the SVPA. The court temporarily committed V.A. to the Department of Human Services Special Offenders Unit (STU) and ordered that a final hearing on V.A.'s continuing need for involuntary commitment as a sexually violent predator be held on November 24, 1999.

II
The initial commitment hearing did not take place until January 20, 2000. V.A. stipulated that the State's proofs established, *1254 by clear and convincing evidence, that he was a sexually violent predator in need of commitment. The court remanded him to the STU and directed that he receive the appropriate care and treatment.
The first review hearing took place on July 9, 2000. V.A. again stipulated that he was in need of continued treatment and commitment. A second review hearing was conducted on February 6, 2001. At the conclusion of the State's presentation, the court concluded that V.A. remained a sexual predator in need of treatment in a confined setting. Two subsequent review hearings each resulted in V.A.'s continued commitment.
On August 1, 2002, a fourth review hearing was conducted. The State presented the testimony of psychiatrist Dr. Stanley Kern and forensic psychologist Dr. Donna LoBiondo, both on the staff of the STU. Dr. LoBiondo interviewed V.A. on July 22, 2002 and prepared a report which was admitted into evidence. She concluded that V.A. still required inpatient sex-offender treatment and remained at risk for recidivism.
Treatment progress thus far has been insufficient to lower [V.A.'s] reoffense risk. Contributory risk factors include inadequate anger control, inadequate mastery of relapse prevention concepts, continuing tendency toward cognitive distortion, and sexual identity issues. This examiner agrees with [V.A.'s] opinion that he has more work to do regarding his arousal to young adolescent females.
Based upon a review of available records and interview data, it is my professional opinion that [V.A.] continues in need of sex offender treatment, and that he still meets the statutory criteria ... for commitment as a Sexually Violent Predator.
Dr. LoBiondo diagnosed V.A. with hebephilia, a sexual and functional arousal to adolescents; poly-substance dependence in remission; and anti-social and narcissistic personality traits with the potential for full blown anti-social personality disorder. V.A. has also shown confusion about his sexual identity, expressing homosexual fantasies as a means of coping with inappropriate sexual ideation involving children. Dr. LoBiondo opined that the cumulative effect of all of these factors created a significant risk for V.A. to re-offend if released from a secured therapeutic environment.
Psychiatrist Dr. Kern shared the same assessment of V.A.'s treatment status and his testimony included a similar admonition:
It is apparent that [V.A.] has improved. However, his therapist stated that he still remains a risk because it was only recently that he admitted that the index offense was premeditated, he has yet to display empathy and there is a discrepancy between his account of his sexual contact with the 13 year old and her report. The treatment plan status review of 5/7/02 indicated that his progress is limited and he has not demonstrated an ability to understand the process in which anger turns into unlawful sexual behavior. A note on 5/31/02 stated that he has not produced evidence of a reduced likelihood to re-offend.
It is my opinion that ... [V.A.] still has serious difficulty in controlling his harmful behavior such that it is highly likely that he will not control his sexually violent behavior and will re-offend. Therefore, he requires continued confinement for care, custody and treatment. It is my opinion that his disorder affects his cognitive, emotional and volitional functioning.
Dr. Kern diagnosed V.A. with pedophilia (sexually attracted to females, non-exclusive type) and personality disorder NOS *1255 with anti-social traits. His diagnosis was based on V.A.'s confusion about his sexual identity; his proclivity to convert anger into inappropriate sexual behavior; lack of empathy with his victims; and the inconsistent accounts given by V.A. and his thirteen-year-old victim regarding his sexual offense. According to Dr. Kern, V.A.'s confusion regarding these issues predisposes him to commit further acts of sexual violence. Finally, although he has been successful in managing his anger within the structured environment of the STU, there is no basis to conclude that he will be able to maintain this level of impulse control if released to the community.
In the face of this testimony, the trial judge nevertheless concluded that the State had failed to prove by clear and convincing evidence that V.A. remained a sexually violent predator in need of confinement.
Neither Doctor Kern nor Dr. LoBiondo were able to explain to my satisfaction why they believe that the respondent still has serious problems controlling his behavior. Serious difficulty is the standard for confinement.
* * * *
I have not heard satisfactory evidence that he does currently have serious difficulty controlling his behavior. He has some difficulty controlling his anger. He has some problem with his sexual identity. As a result of this, he may experiment ... with under-age people. When asked is he predisposed to commit offenses, Dr. LoBiondo responded he was considered so in the past....
He continues to deny the full extent of the crime against the little child. He lacks empathy but no one has told me that he has serious difficulty controlling his behavior. And I've read these reports and I've listened to the testimony, and but for the fact that there is a conclusion in Dr. Kern's report, it is my opinion that [V.A.] still has serious difficulty in controlling his harmful behavior, such that it's highly likely that he will not control his sexually violent behavior and will re-offend.
But I'm simply not persuaded by the reasons given. Dr. LoBiondo says it is my professional opinion that [V.A.] continues in need of sex offender treatment and that he meets the statutory criteria. And again, that's her conclusion and I'm not satisfied by ... clear and convincing proof.
I run into a very grave difficulty here with my reading of W.Z. as I apply it to this case. I do not believe by clear and convincing proof the respondent [sic] continues to be a sexually violent predator. But if the test for release is the need for me to be shown affirmatively that he will not have serious difficulty controlling sexually violent behavior, I haven't been shown that either.
And, I'm obviously, counsel, on the horns of a dilemma.
So I'm going to resolve it this way. I'm going to read [W.Z.] backwards. If I am not convinced clearly that he has a serious difficulty controlling his sexually violent behavior, then I cannot find that he will have serious difficulty controlling sexually violent behavior if he is released.
And therefore, I am going to direct the institution to prepare a [discharge] plan.

III
The court reconvened on August 13, 2002 to consider a discharge plan prepared by the STU staff. The plan called for V.A. to seek and obtain temporary financial assistance through the local welfare office until he can secure permanent employment. The plan proposed temporary housing *1256 through the American Rescue Workers Mission (ARW), a homeless shelter in the City of Newark offering twenty-four hour supervision for the first sixty days of V.A.'s stay. During this initial period, he may leave the facility only when accompanied by an escort. He is also required to work every day for his room and board.
After the sixty-days, [V.A.] will have an independent living structure in which he may leave the residence to seek employment and attend to other responsibilities. The program will provide some assistance in helping [him] obtain employment. [V.A.] will be given the opportunity to reside in [the] `C' Class boarding home for a hundred-twenty five dollars ($125.00) a week, which includes three meals a day and laundry services.
With respect to sex offender treatment, V.A. would attend the individual and group treatment sessions offered by the Irvington Counseling Center. The groups meet for one and one-half hours every other week. He would also receive bi-weekly substance abuse counseling. He is required to pay a $20.00 per session fee to cover both sex offender treatment and substance abuse counseling.
However, the authors of the discharge plan also noted "a major flaw in the living arrangement." Since V.A. cannot leave the ARW without an escort during the first sixty days, he may not be able to attend the therapy sessions. The possibility of arranging for V.A.'s family to assist in his transportation is deemed remote since the victim of his most recent offence was his four-year-old niece. In this light, the plan recommended that the court explore instead V.A.'s gradual discharge. Such a plan would allow him to attend outpatient therapy while confined in the STU. Transportation would be provided by court order through the Department of Corrections.
The State called psychologist Dr. Merrill Berger to challenge the viability of the discharge plan. After reviewing the proposed plan, Dr. Berger identified several problems. Specifically, the plan does not provide for a case manager to supervise V.A. nor does it provide treatment based on a "relapse prevention model." This treatment approach is grounded in continued therapy and contact with peer support and group therapy. Dr. Berger also found unacceptable the plan's proposed housing arrangement at the ARW. She deemed the lack of transportation to the treatment sessions to be a critical problem since it affected V.A. during the period for highest risk of re-offense.
As an alternative, Dr. Berger suggested a gradual release approach which would require V.A.'s continued confinement at the STU while participating in outpatient counseling. Transportation would be provided by the STU staff. This approach would enable the STU treatment staff to closely monitor his progress.
The judge accepted Dr. Berger's assessment of the plan's flaws:
[T]he plan is not good because it interferes with his therapy. That's one of the two problems with this plan.
The two problems are there's nobody to oversee him. Well, the overseer, whether it's supervision for life or whether it's supervision from a mental hospital, is not with him 48 hours a day. He just has to report occasionally. So, no case manager to oversee is not an obstacle to Rescue Mission.
Number two obstacle [is] treatment. Yet, treatment on the outside is much less expensive with the State providing the transportation than it would be to keep him here or there atat the annex.
*1257 Thus, faced with the choice of either continued confinement or outright release under an admittedly flawed discharge plan, the court opted for release.
So, I would say that the conditional discharge that has been presented is not first class. It may not even be third class. But it at least is a sensible discharge plan given the alternatives that I face. The alternative is don't discharge him at all. That's not acceptable.
We stayed the appellant's discharge pending this accelerated appeal.

IV
Review of a trial court's decision regarding a commitment hearing is extremely narrow. State v. Fields, 77 N.J. 282, 311, 390 A.2d 574 (1978). The trial court's determination is given "`utmost deference' and modified only where the record reveals a clear abuse of discretion." In re Commitment of J.P., 339 N.J.Super. 443, 459, 772 A.2d 54 (App.Div.2001). Our Supreme Court has recently articulated the standard for commitment:
To be committed under the SVPA an individual must be proven to be a threat to the health and safety of others because of the likelihood of his or her engaging in sexually violent acts. [T]he State must prove that threat by demonstrating that the individual has serious difficulty in controlling sexually harmful behavior such that it is highly likely that he or she will not control his or her sexually violent behavior and will reoffend.
[In re Commitment of W.Z., 173 N.J. 109, 132, 801 A.2d 205 (2002).]
Here, despite the uncontroverted testimony from the two State's experts, the court found insufficient evidence to conclude that it was highly unlikely that V.A. will be able to control his sexually violent behavior if released. The court's findings were based on its positive assessment of V.A.'s response to inpatient treatment. Relying on his track record at the STU, the court found no basis to question V.A.'s continued ability to control his sexually violent behavior if released into the community. We find such a conclusion unsupported by the evidence and against our directive in E.D. that modification in the terms of confinement follow a gradual de-escalation of restraints.
[T]he intent of the Legislature in enacting the SVPA was to broaden the reach of New Jersey law to afford protection to society from those sexually violent predators who pose a danger as a result of a mental abnormality or personality disorder which makes them likely to engage in repeated acts of predatory sexual violence. In a situation where the State is unable to justify the continued confinement of the committee based on the progress the committee has made during his period of confinement, we believe this legislative intent is best effectuated by releasing the committee subject to intermediate levels of restraint.
[In re the Commitment of E.D., supra, 353 N.J.Super. at 456, 803 A.2d 166.]
The term "intermediate levels of restraints" envisions a comprehensive treatment program in which the restraints on individual liberties associated with institutional confinement are gradually relaxed, eventually leading to outright release into the community. At the very least, the committee must demonstrate successful adjustment to successive reductions of restrictions within the structured environment of a secured facility as a prerequisite to consideration for a conditional release. The goal is to provide the trial judge with a rational and more reliable basis to assess *1258 the committee's likelihood of successful reintegration into society.
Such an approach is already in place and utilized by the Department of Human Services in the treatment of mentally ill patients who are involuntarily committed under N.J.S.A. 30:4-27.1 to 27.23.
The Levels System is designed to provide a uniform process which affords each patient the structure and intensity of supervision appropriate to his or her condition during the course of hospitalization. Level determination is based primarily upon the clinical condition of the patient and related behaviors. The Levels System is not a treatment modality. It is a mechanism to be utilized in determining the degree of structure and supervision necessary for each patient to successfully participate in treatment and rehabilitation programs while maintaining a safe and secure therapeutic milieu for patients and staff alike through clinical determination of the degree of structure and supervision necessary for each patient. Appropriate structure and supervision will also facilitate each patient's successful participation in treatment and rehabilitation programs which are designed to improve functioning and promote positive social adjustment while hospitalized and after discharge in the community.
[N.J.A.C. 10:36-1.1(a); see also N.J.A.C. 10:36-1.2 to 1.7]
Such a phased-in reduction of restraints would also respond to the public safety considerations underpinning the SPVA. In re Commitment of P.C., 349 N.J.Super. 569, 581, 794 A.2d 211 (App.Div.2002); In re Commitments of M.G. and D.C., 331 N.J.Super. 365, 375, 751 A.2d 1101 (App. Div.2000).
The Department of Human Services, through the Division of Mental Health, is the state agency responsible for providing treatment to persons committed under the SPVA. N.J.S.A. 30:4-27.34(b). We therefore direct it to develop and implement within a reasonable amount of time the programs and systemic protocols necessary to bring about the gradual deescalation of restraints we have described. Once this is accomplished, V.A. and any others deemed eligible should be permitted to participate with the goal of achieving a conditional release recommendation. N.J.S.A. 30:4-27.32(c).
Here, the trial judge's prediction of V.A.'s behavior outside the structured setting of the STU is not supported by this inpatient transitional experience and thus exposes the public to an unacceptably high risk that he will decompensate and fall back to his sexually predatory ways.
The conditional discharge order is vacated and the matter is remanded for further proceedings consistent herewith.
NOTES
[1] In 1983, he was charged with the sexual assault of an eighteen-month-old child. He denied the charges and they were later dismissed.