873 A.2d 1269 (2005)
378 N.J. Super. 1
In the Matter of the Civil COMMITMENT OF V.A., SVP 25-99.
Superior Court of New Jersey, Appellate Division.
Argued February 8, 2005.
Decided May 26, 2005.
*1270 Joan D. VanPelt, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney, Brian J. Neff, Assistant Deputy Public Defender, of counsel and on the brief).
Mary Beth Wood, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Attorney General, attorney, Patrick DeAlmeida, Deputy Attorney General, of counsel; Ms. Wood, on the brief).
Before Judges LEFELT, FUENTES and FALCONE.
The opinion of the court was delivered by
FUENTES, J.A.D.
This appeal arises out of the civil commitment of V.A. as a sexually violent predator, pursuant to the provisions of the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. The arguments raised here require us to revisit an issue we addressed in our earlier opinion, In re Commitment of V.A., 357 N.J.Super. 55, 813 A.2d 1252 (App.Div.), certif. denied, 177 N.J. 490, 828 A.2d 917 (2003) (V.A. I). In V.A. I, we reversed the trial court's conditional release order, because the court's prediction of V.A.'s behavior outside the structured setting of the Special Treatment Unit (STU) was not supported by an "inpatient transitional experience."
We thus directed the Department of Human Services (DHS) "to develop and implement within a reasonable amount of time the programs and systemic protocols necessary to bring about the gradual de-escalation of restraints." Id. at 65, 813 A.2d 1252. These programs would provide the trial judge "with a rational and more reliable basis to assess the committee's likelihood of successful reintegration into society." Id. at 64, 813 A.2d 1252.
V.A. now argues that the DHS has failed to comply with our directive. Specifically, he raises the following argument:
POINT ONE
THE TRIAL COURT ERRED IN REFUSING TO RULE ON WHETHER THE STATE HAS COMPLIED WITH THE DIRECTIVE OF THIS COURT IN ITS PRIOR RULING IN THIS CASE. THIS APPELLATE ISSUE SHOULD BE SUMMARILY DISPOSED OF THROUGH A REMAND TO THE TRIAL COURT WITH APPROPRIATE INSTRUCTIONS.
We disagree and affirm.
The record shows that, in response to our directive in V.A. I, the DHS assembled a "working group" of medical professionals and representatives of the Department of Corrections. On September 27, 2003, this group completed a document called "The Written Plan for the Provision of Resident Care" (WPRC). The document describes five different "Phases of Treatment," each representing a gradual relaxation of the restraints attending confinement in the secured environment of the STU. Dr. Merill Berger, Chief Forensic Psychologist for *1271 the Division of Mental Health Services, characterized the WPRC as "a work in progress."
Dr. Berger was unable to provide a statistical breakdown of committees' progress under the standards articulated in the WPRC.[1] The document itself, however, provides a series of time projections for an individual going through the program's five phases of treatment. What follows is a summary of the material therapeutic elements of each phase, together with their respective time projections for successful completion:

Phase I [Intake]: ... During this phase, residents become familiar with the mission of the STU, with the commitment process and with unit rules and expectations. Information is gathered and residents are assessed for the purpose [ ] of court reporting and treatment planning.
* * * *
It is anticipated that most residents will complete the requirements of Phase I in no more than one year.
* * * *

Phase II [Therapy]: ... During this treatment phase residents generally begin the transition from being motivated more by external gains (such as institutional privileges) to internal gains (such as a desire to become a psychologically healthier person). This transition is reflected in a high level of group attendance and appropriate participation.
* * * *
It is anticipated that many residents will complete the requirements of Phase II in one year.
* * * *

Phase III [Core/Intensive]: . . . Throughout Phase III, residents are expected to maintain a high level of motivation, participation, and authenticity in treatment. Residents who falter significantly in any of these areas may be reverted to Phase II. Consequently, the focus of treatment will, at least to some degree shift from intensive sex offender specific interventions to re-establishing rapport and motivation.
The overall objective of Phase III is for identifiable sexual re-offense risk factors to be adequately mitigated by therapeutic interventions and/or discharge planning.
In terms of time to completion, it is anticipated that Phase III will be very variable. While it is anticipated to take at least one year, residents who have undergone sex offender specific treatment prior to entering the STU, and residents who are highly motivated, may progress through Phase III at an accelerated pace. Conversely, residents for whom the identifiable sexual re-offense risk factors have not been adequately mitigated by therapeutic interventions and/or discharge planning cannot progress to Phase IV.
* * * *

Phase IV [Advanced/Honor]: With promotion to Phase IV comes increased levels *1272 of privileges and responsibilities. Phase IV residents are permitted to recreate in the Treatment Building when programs are not in session and afforded more freedom on the living unit. Additional responsibilities include functioning as mentors to newer or lower functioning residents, as well as increased work responsibilities and work hours.
* * * *
In part, progression through Phase IV is based on a resident's ability to sustain all significant treatment gains over a relevant period of time. It is recognized that short-term changes in attitude and behavior are relatively easy to sustain but insufficient for life-time sex offender maintenance. The time period needed for an individual to meaningfully demonstrate an ability to sustain therapeutic changes varies depending on the overall magnitude of therapeutic changes. Thus, a resident who "really changed a lot" in order to be a viable candidate for Phase V deserves a lot of praise but must sustain those changes for a longer period of time than the resident for whom less change was needed.
(Emphasis added.)

Phase V [Transition]: Residents who reach the Transition Phase will have demonstrated consistency in meeting earlier goals and expectations for treatment, while also demonstrating increased responsibility through gradually earned privileges. Residents will initially demonstrate increased responsibility through staff-supervised work assignments and privileges that occur on the grounds. This will be followed by staff-supervised off-grounds privileges and then unsupervised off-grounds privileges.
Based on these time projections, it would take an individual committee approximately four to five years to reach the goal of being released into the community. This projection assumes, of course, an average to above average patient performance, without a negative incident, relapse or other type of regression.
As a court, we are not in a position to determine the medical reasonableness of this approach, or whether it comports with prevailing medical standards. Our role is to review the legal process that led up to the formulation and adoption of the policy. In this light, it is clear to us that, as a preliminary step, the DHS's plan constitutes a good faith attempt at complying with our directive in V.A. I. We expect, however, that the DHS will continue to refine and adjust its treatment protocols in response to the program's treatment history and to incorporate emerging medical developments.
We are concerned, however, that the model used by the DHS to develop the WPRC was not sufficiently inclusive of all possible points of view on the subject. The working group described by Dr. Berger was made up exclusively of representatives from the DHS and the Department of Corrections. While it is true that these two departments of government bear the principal responsibility for formulating, implementing and overseeing the treatment received by individuals committed under the SVPA, they should not develop and adopt, in a vacuum, what is, in essence, a comprehensive regulatory scheme.
In August 2003, the Legislature amended the SVPA to include the following provision:
Notwithstanding the provisions of section 10 of [N.J.S.A.] 30:4-24.2 or any other law to the contrary, the rights and rules of conduct applicable to a person subject to involuntary commitment as a sexually violent predator pursuant to [N.J.S.A.] 30:4-27.24 et seq. shall be established *1273 by regulation promulgated jointly by the Commissioner of Human Services and the Commissioner of Corrections, in consultation with the Attorney General. The regulations promulgated under this subsection shall take into consideration the rights of patients as set forth in section [N.J.S.A.] 30:4-24.2, but shall specifically address the differing needs and specific characteristics of, and treatment protocols related to, sexually violent predators. In developing these regulations, the commissioners shall give due regard to security concerns and safety of the residents, treatment staff, custodial personnel and others in and about the facility.
[N.J.S.A. 30:4-27.34d (emphasis added).]
The legislative history of this amendment further illuminates its purpose. The explanatory Statement accompanying the Bill introducing the amendment provides, in pertinent part, as follows:
Having a separate facility for the control, custody and treatment of these predators presents certain unique concerns directly related to the particular needs, specific characteristics and distinct treatment protocols associated with those residents. To provide clear guidance to residents and staff, it is appropriate to specify the rights and rules of conduct applicable to the sexually violent predators committed pursuant to the New Jersey Sexually Violent Predator Act.
This bill requires the Commissioner of Corrections and the Commissioner of Human Services, in consultation with the Attorney General, to promulgate regulations to delineate these specific rights and rules of conduct. In developing these regulations, the commissioners are to take into consideration the rights afforded all patients under section 10 of P.L. 1965, c. 59 (C.30:4-24.2), as well as the particular needs, specific characteristics and distinct treatment protocols associated [with] the control, custody and treatment of these predators. In addition, the bill directs the commissioners to give due consideration of the security and safety of the residents, treatment staff, custodial personnel and all others in and about these facilities when promulgating these regulations.
(Emphasis added.)
In our view, the treatment modalities embodied in the WPRC clearly fall within the purview of this statute. In addition to describing a course of medical treatment, the levels or "phases" in the WPRC also outline the "rights and rules of conduct" applicable to individuals committed under the SVPA. This approach directly responds to the "gradual de-escalation of restraints" we directed to be a central part of STU's program. As such, the DHS is statutorily required to codify this proposed practice, by promulgating regulations in accordance with the Administrative Procedures Act (APA), N.J.S.A. 52:14B-4; N.J.S.A. 52:14B-4.1.
As we did in V.A. I, supra, 357 N.J.Super. at 64, 813 A.2d 1252, we recognize that public safety is the overarching policy consideration underpinning the SVPA. Memorializing the standards and practices described in the WPRC via regulation advances this public policy. Under the process required by the APA for the promulgation of regulations, the public is invited to comment on the efficacy of the proposed rules, from both a therapeutic and a public safety perspective. This public scrutiny may decrease the likelihood of an unwarranted release, and increase a committee's chances of successfully rejoining society.
The DHS has had more than two years to comply with our mandate in V.A. I. We expect it to take the steps necessary to initiate the process required under the *1274 APA for the promulgation of these regulations forthwith.
Affirmed.
NOTES
[1] Even without the WPRC, individuals detained under the SVPA have been released into society. At our request during oral argument, the Attorney General's office submitted a written report showing that, since 1999, a total of seventy-two individuals have been released from either the STU or its Annex. This figure breaks down as follows: (i) fifteen commitment petitions withdrawn; (ii) seventeen individuals released after initial commitment hearing; (iii) four deceased; (iv) twelve discharged without conditions (of this number six were deported and three returned to prison); (v) eight discharged with conditions, but without judicial oversight; and (vi) sixteen conditionally discharged. These figures dispel the misconception that the SPVA was a program designed to detain individuals indefinitely, without any reasonable prospect of being released.