876 A.2d 869

M.X.L., APPELLANT, v. NEW JERSEY DEPARTMENT OF HUMAN SERVICES/NEW JERSEY DEPARTMENT OF CORRECTIONS, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued April 27, 2005—Decided July 8, 2005.

Before Judges NEWMAN, AXELRAD and HOLSTON, JR.

*John Douard,* Assistant Deputy Public Defender appearing Amicus Curiae argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney; *Mr. Douard,* on the brief).

*Mary Beth Wood,* Deputy Attorney General argued the cause for respondents (*Peter C. Harvey,* Attorney General, attorney;

*Patrick DeAlmeida,* Assistant Attorney General, of counsel, *Ms. Wood,* on the brief).

Appellant filed a pro se brief.

The opinion of the court was delivered by

NEWMAN, P.J.A.D.

■■■ M.X.L. appeals from his placement in the Modified Activities Program (MAP). He contends through an *amicus* brief filed by the Division of Mental Health Advocacy that he was placed on MAP status without a hearing and an opportunity to present evidence in violation of both his federal and State constitutional rights to procedural and substantive due process. He also asserts he was denied a hearing and an opportunity to present evidence contrary to *N.J.S.A.* 52:14B-9. M.X.L. maintains that he should have been given a copy of the confidential appendix which describes the MAP Policies and Procedures and listed residents in MAP. M.X.L. was released from MAP placement on December 8, 2004 and his privileges were reinstated. Because these issues are capable of recurring and of public importance, but may escape review, we have elected to address them. *New Jersey Div. of Youth & Family Servs. v. J.B.,* 120 *N.J.* 112, 118–19, 576 *A.*2d 261 (1990); *Matter of the Commitment of Calu,* 301 *N.J.Super.* 20, 24, 693 *A.*2d 911 (App.Div.1997). We are satisfied that M.X.L.'s due process rights secured by both the federal and State constitutions were not violated upon his placement into Program MAP nor was *N.J.S.A.* 52:14B–9, the contested case provision of the Administrative Procedure Act, (APA) applicable. However, we agree with M.X.L. that he is entitled to a redacted version of the Map Policies and Procedures without the list of other residents in MAP.[1]

---

[1] M.X.L. appealed as of right. *R.* 2:2–3(a)(2). M.X.L. should have sought leave to appeal. *R.* 2:2–4. Even if he had followed the grievance procedure, the action of the Director represented an interim decision in the treatment regimen and not the kind of final agency action contemplated by *R.* 2:2–3(a)(2). However, we grant leave to appeal *nunc pro tunc* to consider the issues described above.

M.X.L. was found to be a sexually violent predator who was civilly committed pursuant to the New Jersey Sexually Violent Predator Act (SVPA), *N.J.S.A.* 30:4-27.24—27.38. The predicate offense for his commitment occurred on June 29, 1990 when K.O., age twenty-two, told the police of her victimization by M.X.L. and his co-defendant. She claimed that she was forcibly taken from a pay phone after being grabbed from behind and possibly struck with a bottle. She found herself inside what she thought to be Thatcher Glass Company, later determined to be the Lock Joint Corporation. M.X.L. was straddling her and kneeling on her upper arms. He punched her face and head with his right hand while holding a knife in his left hand. Meanwhile, his cohort removed her sneakers, jeans, panties and her jacket and pushed up her shirt and bra. Both men then took turns penetrating her mouth, vagina and anus with their penises and also fondled her breasts with their hands and mouth. They stole a gold crucifix ring, a sapphire and diamond ring and a medium length gold chain from her. After they had finished sexually assaulting her they offered to help her find items of her clothing, which she refused. K.O. made it to the road where a truck driver stopped and transported her to the Wharton Police Department. She told the police what had happened to her.

On July 4, 1990, S.F. was interviewed at the Wharton Police Department by investigators from the prosecutor's office. S.F. reported that on July 3, 1990 she was pulled out of her car and thrown to the ground. She told M.X.L. and his co-defendant that she had her period. They removed her tampon. M.X.L. then got on top of her and vaginally penetrated her while at the same time punching her. His co-defendant then did the same. After they were through, both subjects fled the area on foot having stolen assorted pieces of jewelry from her. She flagged down a passing motorist who notified the police.

On July 13, 1990 M.X.L. was arrested and charged with two counts of criminal restraint, two counts of aggravated assault, two counts of unlawful possession of a weapon, two counts of posses-

sion of a weapon for unlawful purposes, two counts of theft from a person, two counts of terroristic threats and four counts of aggravated sexual assault. He pled guilty to two counts of aggravated sexual assault and was sentenced on November 2, 1991 to a prison term of fifteen years.

M.X.L. has committed other criminal offenses which included burglary, theft, possession of a controlled dangerous substance, possession of a weapon, aggravated assault on a police officer, and assault with intent to cause injury. He was diagnosed when he was first civilly committed as a sexually violent predator with the following mental abnormalities and/or personality disorders: paraphilia not otherwise specified (NOS) and anti-social personality disorder.

On September 12, 2000 the trial court at M.X.L.'s initial commitment hearing, found him to be a sexually violent predator in need of commitment, care and treatment. Review hearings were conducted on March 26, 2001, September 24, 2001, March 18, 2002, March 4, 2003, November 3, 2003 and July 16 and 19, 2004, all of which resulted in his continued commitment.

On August 6 and again on September 8, 2004 routine searches of his room at the Special Treatment Unit (STU) uncovered contraband items. Eleven pornographic pictures with one depicting penetration were uncovered hidden inside a tape deck and he had a red container filled with a clear substance emitting a strong odor that was thought to be "hooch." Hooch is slang for alcohol made from moldy bread and fruit juice. Moldy bread was also found. In addition, a number of prohibited items were confiscated which included an LCD television, twenty-eight video games, fifty-three audio tapes, thirty-two music CDs, two speakers, one pair of altered tweezers, four towels, and clothing items that exceeded authorized limits. The seizures were made because the items were either not authorized for retention, exceeded stated facility limits, were altered from original form, not issued through regular channels, exceeded reasonable safety, security or space consider-

ations and were deemed harmful and/or posed a threat to the security or orderly operation of the facility.

M.X.L. admitted the possession of pornography but reasoned that it was only to aid him in masturbation. He denied that the liquid found was alcohol. He explained that he had brought the juice from the kitchen and it had gone bad. The treatment team noted that the alcohol denial was belied by the fact that M.X.L. was fired from his kitchen job on June 20, 2004 and by the discovery of moldy bread which is an ingredient used to make hooch. On August 9, 2004, M.X.L. was placed on Program MAP resulting in the suspension of the following privileges: all packages, job, television game system, and DVDs.

On September 8, 2004, M.X.L. was again found in possession of multiple contraband items including pornography. Confronted with the possession of pornography, he responded that he was not hurting anyone, was lonely and felt deprived of sexual contact. As a result of possessing contraband items while already being in MAP status, a further suspension was implemented and all personal property with the exception of clothing, hygiene items, reading and writing materials and a AM/FM radio were removed from his area.

M.X.L.'s treatment providers discussed his continued problematic behavior including sexual contact with his visiting fiancé and his failure to attend training sessions. M.X.L. believed that his punishment caused an increased sense of being sexually deprived. According to the treatment notes, he admitted to obtaining pornography twice per month over the past year. Once the first set of pictures were confiscated, he felt an increased need to obtain more hardcore and graphic pornography. A further treatment note indicated that M.X.L. failed to recognize the use of pornography as a risk factor for him, particularly when his offense dynamics included the use of a co-defendant as visual stimulus to maintain his arousal during his sexually violent offense.

On October 1, 2004, after a further status review, his treatment team recommended reducing his treatment level from Phase III to

Phase II because of his multiple behavior judgment lapses after being placed on MAP status. Following reviews of October 8, 2004 and November 8, 2004, his suspensions were maintained, but he was encouraged to address his issues in treatment. On December 8, 2004, he was released from MAP status, his privileges were reinstated and he was reduced to Phase II treatment level.

MAP is a component of the clinical treatment program at the STU that focuses on stabilizing disruptive or dangerous behaviors. A primary goal of the STU treatment program is to prepare civilly committed sexual predators to safely return to the community.

There are four levels of MAP: Room, Tier, Wing, and Program. Room, Tier and Wing MAP restrict the unescorted motion of a resident to his room, his tier or his wing. The level of MAP placement is proportionate to the apparent danger or instability reflected by the resident. MAP levels represent an increasing return of privileges, culminating in a return to the general population with all privileges reinstated.

Program MAP is the lowest level of intervention and is instituted when a resident is unwilling to control his anti-social behaviors and has not developed the behavioral skills necessary to maintain appropriate control. MAP can take a number of forms. Here, it involved the suspension of privileges. While in Program MAP, a resident continues to attend all assigned treatment groups unless specifically contra-indicated. MAP status is generally implemented for thirty-day periods, with a review of that status every thirty days or sooner if clinically appropriate.

Removal from MAP status and return of full privileges is warranted when a resident demonstrates the behavioral control skills expected of him. Residents are directed to explore the behavior that resulted in MAP placement in group therapy. Because MAP is a behavior-related treatment modality, if a resident believes that placement in MAP is the result of misunderstanding, the resident is still directed to discuss it in treatment, work to gain an understanding of how a particular situation may have been

handled more effectively and learn how to avoid similar problems in the future.

Upon entry to the STU program, every resident is provided with a handbook currently known as "The Residents Guide to STU." They are advised that if they believe their status is not properly assessed, a grievance can be filed. M.X.L. could have filed a grievance in connection with his MAP placement, but chose not to do so. The filing of a grievance shall not incur "any form of restraint, interference, coercion, discrimination, or reprisals as a result of that action." Grievances must be in writing and submitted on forms available on the unit. The resident may seek assistance from staff if unable to complete the form. The form is to be given to a treatment team member. Responses to the resident will be made within thirty days and will be in writing. If the grievance is not resolved to the resident's satisfaction, it can be forwarded to the unit's clinical director or administrator for final resolution of the complaint.

In enacting the SVPA, the Legislature provided that the committee had rights at a court hearing where an involuntary commitment was first considered and at annual court reviews thereafter to determine if the commitment should be continued, modified, or the committee should be released or conditionally released. In addition to at least ten days notice prior to the court hearing, *N.J.S.A.* 30:4–27.30a, the person involuntarily committed has the following rights:

a. The right to be represented by counsel or, if indigent, by appointed counsel;

b. The right to be present at the court hearing unless the court determines that because of the person's conduct at the court hearing the proceeding cannot reasonably continue while the person is present;

c. The right to present evidence;

d. The right to cross-examine witnesses; and

e. The right to a hearing in camera.

[*N.J.S.A.* 30:4–27.31].

Under *N.J.S.A.* 30:4–27.35 which provides for annual review hearings, "[t]he court may schedule additional review hearings but, except in extraordinary circumstances, not more often than

once every thirty days." Thus, the court may address a resident's concern at a thirty-day interval, but even may respond to a situation that satisfies the extraordinary circumstance criteria in less than thirty days. It is against this general background that M.X.L. contends that he has been deprived of due process under both the federal and State constitutions.

■ M.X.L. contends that he is entitled to a hearing and the opportunity to present witnesses and evidence prior to his placement in the MAP program. He notes that involuntary civil commitment implicates a fundamental liberty interest. *Youngberg v. Romeo,* 457 *U.S.* 307, 102 *S.Ct.* 2452, 73 *L.Ed.*2d 28 (1982). M.X.L. maintains that the implication of a liberty interest which results in the punitive consequences of a MAP placement requires that he be afforded an opportunity to challenge the placement as a matter of due process before the placement is effectuated. He contends inadequate procedures exist because he was not afforded a hearing or meaningful notice before being placed in MAP.

The SVPA provides for the custody, care and treatment of civilly committed sexually violent predators. *N.J.S.A.* 30:4–27.26. The Department of Corrections is responsible for the operation of the facilities designated for sexual predators. *N.J.S.A.* 30:4–27.34(a). The Department of Human Services, Division of Mental Health Services is responsible for providing or arranging for treatment of this population. *N.J.S.A.* 30:4–27.34(b). Treatment protocols are to be designed to address the specific needs of sexually violent predators. Indeed, the SVPA was amended by *L.* 2003, *c.* 156, effective August 15, 2003, to require that regulations be promulgated jointly by the Commissioner of Human Services and the Commissioner of Corrections, in consultation with the Attorney General, taking "into consideration the rights of patients as set forth in section ten of *P.L.* 1965, *c.* 59 (C. 30:4–24.2) . . . [to] specifically address the differing needs and specific characteristics of, and treatment protocols related to, sexually violent predators." *N.J.S.A.* 30:4–27.34(d).

Those responsible to establish these regulations were admonished to "give due regard to security concerns and safety of the residents, treatment staff, custodial personnel and others in and about the facility." The Legislature has thus recognized the need to adopt different treatment regimens for the variety of disabilities that may drive a sexually violent predator to reoffend. Judge Fuentes in the recent opinion of *In re Commitment of V.A.,* 378 *N.J.Super.* 1, 873 *A.*2d 1269 (App.Div.2005) has directed that these regulations be adopted "forthwith." *Id.,* 378 *N.J.Super.* at 7, 873 *A.*2d 1269.

Indeed, the State "enjoys [wide latitude in developing treatment regimens] for sex offenders." *Kansas v. Hendricks,* 521 *U.S.* 346, 368 n. 4, 117 *S.Ct.* 2072, 2085, 138 *L. Ed.*2d 501 (1997). Decisions regarding the treatment program at the STU are based on judgments exercised by qualified professionals. *Youngberg v. Romeo, supra,* 457 *U.S.* at 322, 102 *S.Ct.* at 2461. In administering the clinical treatment program at STU, the emphasis is on stabilizing disruptive or dangerous behaviors. The STU Program is designed to enhance behavioral stability and pro-social functioning. Those residents whose internal behavior controls deteriorate such that they pose a threat or danger to themselves, other residents and/or STU staff are subject to increased external controls and reduction of privileges. The MAP policy in particular is well within the ambit of delegated authority of those responsible for the treatment of the sexually violent predators. Thus, MAP is not a punishment to those involuntarily committed, but a necessary part of the entire treatment regimen to rehabilitate those committed to a return to the community.

If the State were required to provide the same prerequisites to those who are non-compliant with the treatment program, as are given to those who are participating in the program and demonstrating continued appropriate behavior, "the result would be a dramatic illustration that obduracy has the same rewards as acceptance, and so the program itself would become self-defeating, even hypocritical in the eyes of those whom it seeks to help."

*McKune v. Lile,* 536 *U.S.* 24, 48, 122 *S.Ct.* 2017, 2032, 153 *L.Ed.*2d 47 (2002). Indeed, the loss of personal television, less access to facility organizations and gym, reduction in job opportunities and canteen privileges, and restrictions on visitation rights, do not trigger procedural due process protections. *Id.* at 39, 122 *S.Ct.* at 2027–28.

Indeed, we do not view the issue so much from the perspective of due process, but rather when process is due and if the process afforded is adequate in the treatment context. Here, as pointed out, M.X.L. did not even avail himself of the grievance procedure. We are thus without the record that could be made with the filing of the STU form and a written response from a treatment team member. Furthermore, we have no review by the clinical director where a grievance is denied. Had this process been followed, the record made through the grievance procedure could have then been presented by way of a motion for leave to appeal to this court.

■ Moreover, M.X.L. is statutorily entitled to annual reviews. There is nothing to preclude an attorney representing M.X.L. from addressing a MAP placement that may have occurred between reviews and challenging whether it was appropriate to have placed M.X.L. in MAP. The trial court could consider this material along with all the other information presented in deciding whether the committee still suffers "from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment," *N.J.S.A.* 30:4–27.26 or should be released, conditionally released or placed in a more advanced phase of treatment. Thus, the MAP placement may be reviewed retrospectively and the effects of such placements remedial if it was not otherwise appropriate. We are satisfied that neither procedural or substantive due process is violated by suspending M.X.L.'s privileges and placement in Program MAP without a prior hearing.

■ Moreover, on this record, we are satisfied M.X.L.'s placement in Program MAP was justified. In so concluding, we have

even accepted M.X.L.'s contention that he was not in possession of "hooch." However, the possession of the pornographic material over a considerable period of time which he readily acknowledged in subsequent treatment notes was more than adequate to call for his placement in Program MAP.

■ M.X.L. argues that he was entitled to a hearing pursuant to the Administrative Procedure Act, *N.J.S.A.* 52:14B–9, because this was a contested matter. M.X.L. claims that he was given no notice, no appeal and no opportunity to present evidence contrary to the APA.

M.X.L.'s placement in Program MAP is not even a final administrative action, much less a "contested case" governed by the APA. M.X.L. took an appeal as of right pursuant to *Rule* 2:2–3, but as pointed out *infra*, he should have sought leave to appeal. *R.* 2:2–4.

■ Lastly, M.X.L. argues that the confidential appendix furnished to this court and to the *amicus* should be released to him so that a resident of the STU can fairly represent himself. In not releasing the confidential appendix along with other information provided to residents, the State relies on a statement of Dr. Ferguson, the Clinical Director of the STU. According to Dr. Ferguson, possession of the actual MAP policies and procedures is counter-therapeutic to STU residents. That is the sole reason for denying release of the document. The State contends that Dr. Ferguson's determination must be presumed to be reasonable and valid. With respect to the list of residents currently on MAP status, the State asserts that it contains information about other civil committees that cannot be disclosed to other residents.

The assertion that disclosure of the policies and procedures of MAP to residents is counter-therapeutic is unilluminating. Our examination of the confidential appendix showed it to contain the policies and procedures of MAP, the initial MAP placement review form, and a list of residents currently on MAP identifying the rationale for their placement and the restrictions imposed. The

Policies and Procedures of MAP furnishes information about room, tier or wing and the staff's responsibilities in connection with each level. The details do not differ from the kind of information about the STU Program in general contained in the "Residents' Guide to the STU" and furnished to all residents. M.X.L. was told of the reasons his privileges were suspended and why he was placed on MAP status. There is no reason why the Policies and Procedures of MAP should be withheld from a resident when, as here, a copy has been requested.

We, however, agree with the State's concern about information regarding other committees contained in the list of residents currently in MAP status. These concerns can easily be remedied by redacting the information pertaining to other residents. A redacted version of the MAP Policies and Procedures should be provided to M.X.L.

We affirm M.X.L.'s Program MAP placement. We direct that a redacted version of the MAP Policies and Procedures be furnished to M.X.L.