RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-4820-14T2

IN THE MATTER OF THE
CIVIL COMMITMENT OF W.T.
SVP-687-13.

_________________________

 Submitted March 1, 2017 – Decided July 18, 2017

 Before Judges Fuentes and Simonelli.

 On appeal from the Superior Court of New
 Jersey, Law Division, Essex County, Docket No.
 SVP-687-13.

 Joseph E. Krakora, Public Defender, attorney
 for appellant W.T. (Nancy C. Hayes, Designated
 Counsel, on the brief).

 Christopher S. Porrino, Attorney General,
 attorney for State of New Jersey (Melissa H.
 Raksa, Assistant Attorney General, of counsel;
 Amy Beth Cohn, Deputy Attorney General, on the
 brief).

PER CURIAM

 Appellant W.T. appeals from the June 10, 2015 Law Division

judgment involuntarily committing him to the Special Treatment

Unit (STU) as a sexually violent predator pursuant to the Sexually
Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. We

affirm.

 An involuntary civil commitment can follow service of a

sentence, or other criminal disposition, when the offender

"suffers from a mental abnormality or personality disorder that

makes the person likely to engage in acts of sexual violence if

not confined in a secure facility for control, care and treatment."

N.J.S.A. 30:4-27.26; see also N.J.S.A. 30:4-27.25. To civilly

commit an individual, the State must prove by clear and convincing

evidence:

 (1) that the individual has been convicted of
 a sexually violent offense; (2) that he
 suffers from a mental abnormality or
 personality disorder; and (3) that as a result
 of his psychiatric abnormality or disorder,
 it is highly likely that the individual will
 not control his or her sexually violent
 behavior and will reoffend[.]

 "Although the first two elements derive
 directly from the statute, to comport with
 substantive due process concerns, [the] Court
 interpreted the third statutory element as
 requiring the State to show that a person is
 'highly likely,' not just 'likely,' to
 sexually reoffend."

 [In re Civil Commitment of R.F., 217 N.J. 152,
 173 (2014) (citations omitted) (quoting In re
 Commitment of W.Z., 173 N.J. 109, 130
 (2002)).]

 In order to be considered a sexually violent predator, an

individual must have committed a sexually violent offense.

 2 A-4820-14T2
N.J.S.A. 30:4-27.26. Sexual assault is considered a sexually

violent offense. Ibid. With this legal framework in mind, we

will now consider the facts that led to W.T.'s commitment under

the SVPA.

 On December 14, 2000, W.T. pled guilty to first-degree

aggravated sexual assault of a child under the age of thirteen,

N.J.S.A. 2C:14-2(a)(1). This conviction was predicated on the

following facts. On October 14, 2000, W.T., then age eighteen,

grabbed a twelve-year-old girl identified here as L.B, pulled on

her clothes, and separated her from a friend with whom she was

walking. W.T. slapped L.B. in the faced and threw her on the

porch of a nearby house. A neighbor interrupted the assault and

told W.T. let L.B. go. W.T complied, but followed L.B. and her

friends as they walked to a nearby store. W.T. again approached

L.B., pulled her hair, grabbed her arm, and forced her into the

hallway of an apartment building while covering her mouth and

repeatedly striking her on the left side of her face. W.T. pulled

down one side of L.B.'s pants and inserted his penis into her

vagina. When L.B. resisted, he slapped and choked her and held

down her arms. W.T. stopped the assault when L.B. started to

scream and cry. The police arrested W.T. shortly thereafter.

While being processed, he exposed his penis to a female police

officer and told her to "suck this."

 3 A-4820-14T2
 Kenneth L. McNiel, Ph.D. conducted a psychological evaluation

of W.T. at the Adult Diagnostic and Treatment Center (ADTC) to

determine if he was eligible for sentencing under the New Jersey

Sex Offender Act (SOA), N.J.S.A. 2C:47-1 to -10. During the

evaluation, W.T. reported a chronic history of daily marijuana

intoxication and intermittent use of ecstasy and angel dust; and

he had an extensive history of delinquency, including car theft

and drug dealing. His Family Part dispositions included a period

of confinement at the Juvenile Detention Center in Jamesburg. W.T.

also reported an extensive pattern of compulsive sexual thoughts

and unusual sexual behaviors, including bondage, orgies, exposing

himself, and using sexual toys. He said he masturbated several

times daily and had compulsive masturbation fantasies involving

rough sex and rape. W.T. admitted he was unable to control his

sexually aggressive thoughts and fantasies and had raped two or

three girls in the fifteen-year-old range.

 Dr. McNiel found W.T. presented with severe psychological

disturbance, including a likely psychotic disorder, and was a

severely disturbed and impulsive individual with co-morbid

psychotic symptomatology and sexual pathology. He found W.T.

eligible for sentencing under the SOA, and recommended W.T. serve

hi sentence in the ADTC where he would receive sex offender therapy

and psychiatric treatment.

 4 A-4820-14T2
 On April 4, 2001, the court sentenced W.T. to an eight-year

term of imprisonment to be served in the ADTC, with six years,

nine months and twenty-three days of parole ineligibility. W.T.

was also sentenced to community supervision for life (CSL) and

ordered to comply with the registration requirements of Megan's

Law. On August 21, 2003, his sentence was amended to include a

five-year term of parole supervision to begin upon completion of

his sentence. Defendant was sentenced under the version of the

No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, that existed in

April 2009, which required the sentencing judge to find defendant

committed a "violent crime." The statute defined "violent crime"

as any first or second degree offense in which the actor causes

death or serious bodily injury. N.J.S.A. 2C:43-7.2(d); see also

State v. Thomas, 166 N.J. 560, 567-68 (2001). “The Legislature

amended NERA on June 29, 2001, eliminating the "violent crime"

provision, opting instead to enumerate the specific crimes subject

to NERA.” State v. Norman, 405 N.J. Super. 149, 152 n.2 (App.

Div. 2009).

 While incarcerated at the ADTC, W.T. incurred over 200

institutional infractions for which he was sanctioned. Many of

his infractions demonstrated sexually inappropriate behavior,

including masturbating in his cell doorway; making sexual

gestures; demanding sex from other inmates; having an ongoing

 5 A-4820-14T2
sexual relationship with a fellow inmate; and ejaculating and

throwing semen out of his cell. W.T. also committed nonsexual

infractions for which he was sanctioned, including numerous

assaults; possession of a weapon; assault with a weapon; fighting

with a person; threat with bodily harm; setting fires; refusing

to obey; conduct which disrupts; and destroying/altering

government property. On October 4, 2005, W.T. was charged with

fourth-degree aggravated assault. He pled guilty, and was

sentenced to ninety days consecutive to his present sentence.

 Prior to completion of his sentence, W.T. was referred for

civil commitment under the SVPA. Because one of the evaluating

psychiatrists found W.T. did not meet the criteria for commitment,

he was released from the ADTC on December 10, 2008. On February

9, 2009, he was placed on the Global Positioning Satellite (GPS)

Monitoring Program.

 W.T.'s criminal activity continued after his release. He was

charged with throwing bodily fluids at Department of Corrections

employees; pled guilty to an amended charge of improper behavior;

and was sentenced to one day in jail. He was charged with

aggravated assault with a deadly weapon; pled guilty; and was

sentenced to ten days in jail. He cut off his GPS ankle transmitter

without the Parole Board's approval, and was charged with failure

to comply with sex offender monitoring device and interfering with

 6 A-4820-14T2
sex offender monitoring device. He was charged with fourth-degree

failure to register, N.J.S.A. 2C:7-2(e); pled guilty; and was

sentenced to one-year in prison. While incarcerated, he was

charged with indecent exposure and making sexual

proposals/threats, and sanctioned ninety days' administrative

segregation for each charge.

 Prior to W.T.'s max-out date of January 16, 2014, the State

filed a petition seeking his involuntary commitment under the

SVPA. Judge Philip M. Freedman conducted a commitment hearing,

at which a psychiatric expert, Roger M. Harris, M.D., and a

psychological expert, Christine E. Zavalis, Psy.D., testified for

the State, and a psychological expert, Timothy P. Foley, Ph.D.,

testified for W.T.

 Dr. Harris diagnosed W.T. with Antisocial Personality

Disorder (ASPD) and Cannabis and Alcohol Use Disorders. He

explained that these conditions do not spontaneously remit; only

through treatment can one learn to control the impulses caused by

these disorders; and the combination of an ASPD and Cannabis and

Alcohol Abuse Disorders increased W.T.'s risk to sexually

reoffend. Dr. Harris testified that W.T. demonstrated he had

little ability to control his aggressiveness, both sexual and non-

sexual, and when combined with alcohol or cannabis, whatever

inhibitions remained would be quickly eroded, allowing W.T. to act

 7 A-4820-14T2
impulsively without thinking and without regard to himself or

societal norms.

 Dr. Harris testified that W.T.'s ASPD manifested as a serious

difficulty controlling his sexual offending behavior. He opined

that although ASPD alone does not predispose one to sexually

reoffend, it did in W.T.'s case. He was concerned that, in both

statements and drawings, W.T. demonstrated extremely poor impulse

control, severe cognitive distortions, and anger toward women.

Dr. Harris opined that W.T.'s inability to suppress or control

himself demonstrated his profoundly poor regulation in both sexual

and nonsexual realms. Dr. Harris emphasized that all of these

examples overwhelmingly demonstrated that not only was W.T.

sexually preoccupied, but was sexually aggressive in ways other

than sexually assaulting people, such as the indecent exposure,

the throwing of semen, the fantasies of raping, and actual self-

reports of raping other minor females.

 Dr. Harris testified that W.T. scored a "7" on the STATIC-

99R1 actuarial instrument, indicating that he fell within the high

1
 The STATIC-99R is an actuarial test used to estimate the
probability of sexually violent recidivism in adult males
previously convicted of sexually violent offenses. See Andrew
Harris et al., Static-99 Coding Rules Revised-2003 5 (2003). Our
Supreme Court has explained that actuarial information, including
the Static-99, is "`simply a factor to consider, weigh, or even
reject, when engaging in the necessary factfinding under the

 8 A-4820-14T2
risk range to sexually recidivate when released from prison.

However, that score did not fully reflect W.T.'s risk, as he also

demonstrated dynamic and psychological factors not accounted for

in the STATIC-99R that placed him in the high risk category,

namely, a profound inability to self-regulate, the use of sex as

a coping mechanism, poor cognitive problem-solving, and his

sexualized aggression. Dr. Harris also testified that W.T. scored

a "32.2" on the Psychopathy Checklist-Revised, 2nd Edition (PCL-

R),2 which indicated he met the diagnostic criteria for

psychopathy.

 Based on his review of the ADTC reports and the STU treatment

notes, Dr. Harris concluded that W.T. made insufficient progress

through treatment to mitigate his risk factors to sexually

reoffend. He explained that W.T. served the majority of his

incarceration at the ADTC in detention because of sanctions for

behavioral problems and institutional infractions, and interfered

SVPA."' R.F., supra, 217 N.J. at 164 n.9 (quoting In re Commitment
of R.S., 173 N.J. 134, 137 (2002)).
2
 The PCL-R provides a dimensional score that represents the
extent to which a given individual is judged to match the
"prototypical psychopath." The cut-off score on the PCL-R
indicative of psychopathy is 30. That is, an individual who
receives a score of 30 or above on the PCL-R meets diagnostic
criteria for psychopathy.

 9 A-4820-14T2
with his engagement in treatment. Even when W.T. was in the

general population at the ADTC, he was noncompliant with treatment

and showed very poor cooperation with any rehabilitative and

programming efforts.

 Dr. Harris testified that since W.T.'s temporary commitment

to the STU in 2014, his behavioral problems short-circuited his

treatment progress. W.T. did poorly, incurred multiple MAP3

placements, and was currently on MAP. Dr. Harris noted that at

the STU, W.T. continued his ADTC incarceration history of acting

out, which demonstrated a profound inability to control himself.

 Dr. Harris diagnosed W.T. with Alcohol and Cannabis Use

Disorders based on W.T.'s self-reports that he used marijuana

daily beginning as an adolescent, and admission to abusing alcohol,

cocaine, ecstasy and angel dust, overdosing on hallucinogenic

mushrooms, and selling drugs. W.T. reported that he attended

outpatient treatment for substance abuse but did not complete the

program, and he did not attend substance abuse treatment while on

parole and resumed consuming alcohol during this period. Dr.

Harris noted that with W.T., an abuse of substances acted as a

3
 The Modified Activities Program (MAP), a component of the
clinical treatment program at the STU that focuses on stabilizing
disruptive or dangerous behaviors, is a behavior-related treatment
modality. M.X.L. v. NJDHS/NJDOC, 379 N.J. Super. 37, 45 (App.
Div. 2005).

 10 A-4820-14T2
disinhibitor and whatever inhibitions remained would be quickly

eroded allowing W.T. to act impulsively, criminally, and sexually,

without thinking, and without regard to himself or societal norms.

Dr. Harris concluded that W.T. had not had sufficient substance

abuse treatment to mitigate his risk.

 Dr. Harris concluded that W.T. suffers from: (1) a severe

personality disorder that affects him emotionally, cognitively,

or volitionally so as to predispose him to commit acts of sexual

violence; and (2) a disinhibiting Alcohol and Cannabis Abuse

Disorder. He opined that W.T.'s ASPD caused him to have serious

difficulty controlling his sexual offending behavior such that he

was highly likely to sexually reoffend if not confined to the STU

for treatment.

 Dr. Zavalis diagnosed W.T. with ASPD with Borderline

features, which is characterized by a failure to conform to

societal norms and lawful behavior, deceitfulness, impulsivity,

irritability and aggressiveness, reckless disregard for safety of

self or others, irresponsibility and lack of remorse. She also

explained that the ASPD diagnosis took into account W.T.'s criminal

behavior and aggressiveness, impulsive acts, and lack of any

remorse or empathy for his victims.

 Dr. Zavalis testified that the borderline features of W.T.'s

personality manifested in a pattern of instability in his

 11 A-4820-14T2
interpersonal relationships, self-injurious behavior, paranoia,

and intense anger. W.T.'s rape of L.B. demonstrated borderline

behavior because W.T. acted sexually aggressive, compulsively, and

brazenly in the presence of witnesses who could easily identify

him, without any regard for the impact on the victim, the

witnesses, or himself. W.T.'s borderline features were further

demonstrated when, in response to L.B.'s rejection and resistance

to his sexual advances, he repeatedly hit her and then raped her.

 Dr. Zavalis noted that W.T.'s personality disorder also

manifested in non-sexual ways, as evidenced by his many violent

institutional infractions at the ADTC and MAP placements for

aggressive behavior since arriving at the STU. Alhough an ASPD

diagnosis alone does not predispose one to sexual violence, Dr.

Zavalis concluded it did in W.T.'s case.

 Dr. Zavalis also diagnosed W.T. with Cannabis Use Disorder,

which refers to a "cluster of cognitive, behavioral, and

physiological symptoms indicating that the individual continues

using marijuana despite significant substance-related problems."

Dr. Zavalis explained that this disorder did not, on its own,

predispose W.T. toward sexual violence; however, if W.T. relapsed,

it could have a disinhibiting effect on his behavior. Dr. Zavalis

testified that the combination of W.T.'s ASPD and Cannabis Use

Disorder increased his risk to sexually reoffend.

 12 A-4820-14T2
 Dr. Zavalis provisionally diagnosed W.T. with Other Specified

Paraphilia Disorder (nonconsent) based on his contradictory

statements about his deviant arousal. Despite W.T.'s

contradictions, Dr. Zavalis believed that he likely met the

criteria for this disorder, but she declined to diagnose the full

Paraphilia Disorder. However, she recommended that STU clinicians

address the issue of W.T.'s deviant arousal to nonconsensual sex

in his treatment. She also provisionally diagnosed W.T. with

Borderline Intellectual Functioning based on prior testing

administered at the ADTC.

 Dr. Zavalis also found it significant the extent to which

W.T. acted out while incarcerated. She remarked that the

significance of the 200 disciplinary charges was not only the

sheer number of infractions, but also the wide variety of the

behavior, and found these acts illustrative of W.T.'s significant

lack of emotional control and an inability to cope with stressors.

W.T. externalized blame for these acts and took no responsibility

or ownership of the behaviors that resulted in the sanctions

imposed against him.

 Dr. Zavalis noted that since arriving at the STU, W.T.

incurred several MAP placements, had been on MAP continuously

since September 2014, and failed to take any responsibility for

these placements. W.T. failed to understand that by acting

 13 A-4820-14T2
similarly at the STU as he did at the ADTC, he was repeating his

prior pattern of behavior that resulted in sanctions against him

and the removal of privileges. W.T. also attempted to "play" the

STU staff against each other, which indicated the strength of his

personality disorder.

 Dr. Zavalis testified that W.T. scored "32.2" on the PCL-R

she administered, which placed him above the threshold for

psychopathy, and a "7" on the STATIC-99R she administered, which

placed him within the high risk range to sexually recidivate. She

noted that W.T. did not have the necessary treatment progress to

mitigate his risk; although he engaged in treatment periodically

at the STU, his knowledge of concepts was minimal and he lacked

coping skills and sufficient relapse prevention strategies; and

the strategies he described -- walking away and avoiding the

situation -- were unrealistic given his history. W.T. lacked the

ability to manage his feelings when he does not get what he wants

and resorts to "maladaptive coping strategies when under stress."

 In her risk assessment, Dr. Zavalis considered W.T.'s high

STATIC-99R and PCL-R scores, and his various dynamic factors

unaccounted for in the actuarial tools, including his failure to

comply with any type of community or institutional supervision and

the frequent violation of both; lack of any deterrent effect of

external supervision upon him; hostility, impulsivity, emotional

 14 A-4820-14T2
instability and sexual preoccupation; severe ASPD; use of sex to

cope with stressors as evidenced by the almost compulsive

masturbation while on the telephone despite complaints by others;

and utter disregard for himself or others. Dr. Zavalis found

there were no mitigating factors; W.T. had no benefit of any

treatment effect; and he failed to comply with CSL conditions as

evidenced by his parole violations and demonstrated ongoing

behavioral issues.

 Dr. Zavalis concluded that W.T.'s severe ASPD affected his

emotional, volitional, and cognitive capacities, and predisposed

him to commit sexually violent acts, and his Cannabis Use Disorder

could act as a disinhibitor and erode any self-regulation should

he relapse. Dr. Zavalis opined that W.T. was highly likely to

sexually reoffend if not confined.

 Dr. Foley agreed that W.T. met the diagnostic criteria for

ASPD and Cannabis Use Disorder. However, he did not find that

W.T.'s ASPD affected volitional controls that cause a

predisposition to commit acts of sexual violence. He testified

that in W.T.'s case, he would need more evidence of a pattern of

paraphilic acts -- not just the one rape -- in addition to a

diagnosis of ASPD in order to find that W.T. is predisposed to

sexual violence.

 15 A-4820-14T2
 Dr. Foley reviewed W.T.'s sexual and non-sexual offending and

previous mental health assessments. He testified that the rape

of L.B. was an unambiguous sexually violent act; however, he was

unsure whether W.T.'s indecent exposure/masturbation while

incarcerated should have been scored on the STATIC-99R as a sexual

offense. He was also uncertain whether W.T.'s repeated acts of

throwing semen from his cell were sexualized behaviors or just

expressions of anger and disgust. Nevertheless, Dr. Foley did not

find that these institutional behaviors would necessarily increase

W.T.'s risk to sexually reoffend in the community.

 Dr. Foley agreed with Dr. McNiel's finding that W.T. suffers

from a likely psychotic disorder and Dr. McNiel's questioning of

W.T.'s amenability for treatment. He also agreed with Dr. Harris

that W.T.'s inability to self-regulate caused self-defeating

behaviors that led to sanctions such as MAP placements at the STU,

and admitted that W.T. is a "really disturbed impulsive individual

with co-morbid psychotic symptomatology and sexual pathology as

well." However, he believed that if W.T. dedicated himself, and

if his mental health issues were under control, he could

participate in treatment. Nonetheless, he conceded that W.T.'s

history suggested he would not comply with the treatment program

and would have a "great deal of difficulty with it, not so much

 16 A-4820-14T2
with the content, but with the behavioral regulation that would

be necessary to go along with it."

 Although conceding that W.T.'s ability to control himself in

the community was "really questionable," Dr. Foley found that he

was less than highly likely to sexually reoffend because of the

absence of a Paraphilia diagnosis and his estimation of the STATIC-

99R score. Dr. Foley believed that W.T. was highly likely to

reoffend in general as opposed to sexually, and stated that if

W.T. was re-arrested "the odds are it wouldn't be for a sexually

violent offense, it would be for something else." Dr. Foley

concluded that a drug treatment program and psychiatric services

would be appropriate for W.T. (Aa400) He opined that W.T. did not

satisfy the criteria for commitment under the SVPA and should be

released.

 Judge Freedman rejected Dr. Foley's opinion that W.T.'s ASPD

does not predispose him to commit sexually violent acts, or that.

W.T.'s behaviors while incarcerated could not be understood as

sexual in nature and instead were expressions of anger and disgust.

The judge found it more logical and reasonable to conclude that

W.T.'s conduct was sexually based. The judge determined there was

sufficient evidence to conclude that W.T.'s conduct, in

conjunction with the very serious offense of aggravated sexual

assault, showed his predisposition to re-offend sexually.

 17 A-4820-14T2
 Judge Freedman found that the incident where W.T. exposed

himself to a female officer during processing after his arrest for

the aggravated sexual assault, and the exposure/masturbation while

incarcerated, were significant in this case. The judge noted that

Dr. Zavalis correctly utilized indecent exposure/masturbation

incident as the predicate sexual offense which corresponded to a

higher STATIC-99R score. The judge reiterated:

 I think that's the basic issue here -- I think
 that there's more than an ample basis to
 conclude that [the indecent
 exposure/masturbation incident] was sexually
 motivated . . . that he can't control his
 sexual conduct . . . and that the experts of
 the [S]tate are well within reason to rely on
 all of his conduct after his brazen sexual
 assault to conclude that his [ASPD] Disorder
 predisposes him, and that it wasn't just a
 random . . . anti-social act.

 Judge Freedman also discussed Dr. McNiel's report and W.T.'s

psychological testing at the ADTC, and stressed the importance of

many of W.T.'s representations and admissions during that testing.

The judge commented:

 Every person that gets convicted of a sexually
 violent offense goes to Avenel. One of these
 reports is in every one of those cases. I've
 never seen [someone's psychological
 condition] described as severe, and I have
 never seen a depiction of an ejaculating penis
 referred to in a house, tree, person test.

 . . . .

 18 A-4820-14T2
 [T]hese admissions [of additional 15-year-old
 victims] don't strike me as the kind of
 admissions somebody makes who is just trying
 to get into Avenel . . . and that's one of the
 key issues here, how people look at this
 particular document[.]

 On the issue of conditional release into the community, Judge

Freedman found that W.T. would "clearly not be amenable" and

pointed to W.T.'s cutting off his GPS transmitter. Moreover, the

judge found that because W.T. could not follow rules and

regulations when incarcerated, "there's no reason to believe he

would do so outside."

 In conclusion, Judge Freedman credited the opinions of the

State experts and found that W.T. suffers from a personality

disorder that affects him cognitively and volitionally such that

he is predisposed to engage in acts of sexual violence as

demonstrated by the rape of L.B. and his sexually-related conduct

thereafter. The judge determined that W.T. would have serious

difficulty controlling his sexually violent behavior if released

and would be highly likely in the foreseeable future to commit

sexually violent acts. The judge stated:

 I find that what he "tends to do" can be very
 dangerous. He hasn't been outside. He resorts
 to shanks. . . . He's willing to do violence.
 He's threatened people. He's engaged in
 threatening conduct. [W]hat he tends to do
 is very serious. He committed a very serious
 sex offense. He's engaged in sexually[-]
 related conduct ever since and there's no

 19 A-4820-14T2
 reason to believe that if he were on the street
 he wouldn't be engaging in sexually violent
 conduct, as well as other kind[s] of criminal
 activity.

 . . . .

 Given the variety, and the extensiveness of
 his . . . sexually-related conduct, in
 prison, and at the STU, and his . . . profound
 inability to control himself . . . for the
 protection of the public and [W.T.] I will
 commit him.

The judge committed W.T. to the STU for the protection of the

public, and for W.T. himself, because there was no question he

would be engaged in conduct that would get him into "serious and

deep trouble."

 On appeal, W.T. argues that the State failed to prove he

suffers from a mental abnormality which predisposes him to commit

acts of sexual violence because his diagnosis of ASPD does not

qualify as a mental abnormality under N.J.S.A. 30:4-27.26. He

also argues that his impulsive conduct is not necessarily sexually

motivated, and the State failed to prove that any subsequent

conduct in which he may engage if released would be of a sexual

nature.

 Our review of a commitment determination is extremely narrow.

R.F., supra, 217 N.J. at 174. "The judges who hear SVPA cases are

generally 'specialists' and 'their expertise in the subject' is

entitled to 'special deference.'" Ibid. (citation omitted). "The

 20 A-4820-14T2
final decision whether a person previously convicted of a sexually

violent offense is highly likely to sexually reoffend lies with

the courts, not the expertise of psychiatrists and psychologists.

Courts must balance society's interest in protection from harmful

conduct against the individual's interest in personal liberty and

autonomy." Ibid. (citations omitted). "A trial judge is 'not

required to accept all or any part of [an] expert opinion[ ].'

The ultimate determination is 'a legal one, not a medical one,

even though it is guided by medical expert testimony.'" Ibid.

(alterations in original) (quoting In re D.C., 146 N.J. 31, 59,

61 (1996)). We should not modify the judge's determination "unless

'the record reveals a clear mistake.'" Id. at 175 (quoting D.C.,

supra, 146 N.J. at 58). "So long as the trial court's findings

are supported by 'sufficient credible evidence present in the

record,' those findings should not be disturbed." Ibid. (quoting

State v. Johnson, 42 N.J. 146, 162 (1964)).

 Governed by these standards, we discern no basis to disturb

Judge Freedman's decision. First, it is not necessary that an

individual suffer from a mental abnormality to be deemed a sexually

violent predator under the SVPA. A personality disorder alone may

be used as a basis to conclude that one has a predisposition to

sexually reoffend. See N.J.S.A. 30:4-27.26 (defining a "sexually

violent predator," in part, as a person who "suffers from a mental

 21 A-4820-14T2
abnormality or personality disorder that makes the person likely

to engage in acts of sexual violence if not confined in a secure

facility for control, care and treatment") (emphasis added); see

also In re Civil Commitment of W.Z., 173 N.J. 109, 129 (2002). It

is also not necessary that an individual have a sexual compulsion,

such as paraphilia, or a complete or total loss of control over

his or her behavior to be deemed a sexually violent predator under

the SVPA. W.Z., supra, 173 N.J. 129. Rather, the individual must

be unable to control his or her sexually violent behavior. Ibid.

 The record amply supports Judge Freedman's findings that W.T.

presently suffers from a personality disorder and that as a result

of his personality disorder, it is highly likely that he will not

control his sexually violent behavior and will reoffend if not

confined to the STU for treatment. Even though W.T. was not

diagnosed with a form of paraphilia, the State's experts diagnosed

him with severe ASPD that affected him emotionally, cognitively,

or volitionally so as to predispose him to engage in acts of sexual

violence. The State's experts opined, credibly, that as a result

of his personality disorder, it was highly likely that W.T. would

sexually reoffend if not confined to the STU for treatment.

 Affirmed.

 22 A-4820-14T2